IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DON R. CLARK,<br><br>Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>Defendant. | CV 12–191–M–DLC-JCL<br><br><br>FINDINGS &<br>RECOMMENDATION |

Plaintiff Don Clark brings this action under 42 U.S.C. § 405(g) seeking

judicial review of the decision of the Commissioner of Social Security denying his

application for disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401-433. Clark protectively filed his benefit application in

June 2006, alleging disability since September 2003, due to sleep apnea,

migraines, gout, arthritis, hypertension, pretibial edema, depression, allergic

rhinitis, gastroesophageal reflux disease, vertigo, and bunions. (Tr. 176-80; 204).

Clark's application was denied initially and on reconsideration, and by an ALJ

following an administrative hearing. (Tr. 17-28). After the Appeals Council

denied his request for review, Clark filed an action in this Court seeking judicial

review. (Tr. 862, 873). The Court found that the ALJ erred because he did not provide any reasons for rejecting the 100% disability rating assigned to Clark by the Department of Veterans Affairs ("VA"). (Tr. 862-72; 873-78). The Court also noted that because the administrative record did not contain a copy of the VA's rating decision, it was not possible to determine whether the ALJ had considered all of the evidence underlying the VA's decision. (Tr. 871). The Court reversed and remanded this case to the agency for further proceedings. (Tr. 877-79).

A second administrative hearing was held in June 2010, after which the ALJ issued a new decision again denying Clark's disability claim. (Tr. 744-62; 769-842). The Appeals Council denied Clark's subsequent request for review, thereby making the ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 725-26). Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

Clark was 52 years old at the time of his alleged onset date, and 60 years old at the time of the ALJ's most recent decision.

## I.     Standard of Review

This Court's review is limited. The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where the decision is based on legal error. *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1

(9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). This Court must uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record." *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004). "[I]f evidence exists to support more than one rational interpretation," the Court "must defer to the Commissioner's decision." *Batson*, 359 F.3d at 1193 (*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999). This Court "may not substitute its judgment for that of the Commissioner." *Widmark*, 454 F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

## II.     **Burden of Proof**

To establish disability, a claimant bears "the burden of proving an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Batson*, 359 F.3d at

1193-94 (*quoting* 42 U.S.C. § 423(d)(1)(A)).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520. The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). At the first step, the ALJ will consider whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If not, the ALJ must determine at step two whether the claimant has any impairments that qualify as "severe" under the regulations. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will compare those impairments to the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ finds at step three that the claimant has an impairment that meets or equals a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(a)(iii). If, however, the claimant's impairments do not meet or equal the severity of any impairment described in the Listing of Impairments, then the ALJ must proceed to step four and consider whether the claimant retains the residual functional capacity (RFC) to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant establishes an inability to engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant

can perform other work in the national economy.  20 C.F.R. § 404.1520(a)(4)(v).

## III.  <u>Discussion</u>

Following the steps in the sequential evaluation process, the ALJ first found

that Clark met the insured status requirement of the Act through December 31,

2009, and had not engaged in substantial gainful activity since his alleged onset

date.  (Tr. 746).  Moving to step two, the ALJ found that Clark had the following

severe impairments through his date last insured: obstructive sleep apnea, gout,

migraines, status post bilateral carpal tunnel release, degenerative disc disease of

the cervical and lumbosacral spine, gastroesophageal reflux disease, diabetes

mellitus, type II, and tear of the brachialis tendons in the right arm.  (Tr. 746).  At

step three, the ALJ determined that Clark did not have an impairment or

combination of impairments that met or medically equaled any impairment

described in the Listing of Impairments.  (Tr. 749).  The ALJ also found that while

Clark's "medically determinable impairments could reasonably be expected to

cause the alleged symptoms," his "statements concerning the intensity,

persistence, and limiting effects of th[o]se symptoms" were not entirely credible.

(Tr. 751-52).  The ALJ then determined that Clark could perform a limited range

of light work, and was thus capable of performing his past relevant work as a

physician's assistant.  (Tr. 750-51; 761).

## A.    Severe Impairments

Clark argues the ALJ erred at step two by not classifying his depression, heel spurs, osteoarthritis of the feet, obesity, and an adjustment disorder as severe impairments.

An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 416.921.  An impairment may be considered non-severe if the evidence establishes only a slight abnormality that has no more than a minimal effect on an individual's ability to work.  *See* SSR 85-28; *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988).  The claimant bears the burden of establishing the severity of an alleged impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings.  20 C.F.R. § 416.908.

Clark maintains the ALJ erroneously found that his heel spurs and osteoarthritis of the feet were not severe.  In November 2003, Clark underwent a general medical examination performed by VA physician Dr. Robert Schore.  (Tr. 550-57).  As the ALJ recognized, X-ray results confirmed that Clark had heel spurs and "mild" or "slight" osteoarthritis in his feet.  (Tr. 554-55l; 747).  But because there were "no objective findings of osteoarthritis beyond the mild findings" identified by Dr. Schore, the ALJ found that Clark's foot impairments

did not cause anything more than mild limitations. (Tr. 747). The ALJ also observed that in December 2006, Clark reported having worn orthotics and corrective shoes for years, and indicated they helped with his foot pain. (Tr. 644; 747). Notably, Clark does not point to any objective medical evidence establishing that his bone spurs or osteoarthritis were anything more than mild. He simply claims that the X-ray results discussed by the ALJ support his subjective testimony that foot pain prevents him from walking more than two blocks on a good day. (Tr. 209). As discussed below, however, the ALJ provided sufficiently clear and convincing reasons for discrediting Clark's subjective testimony. The ALJ reasonably found based on the objective medical evidence that Clark suffered from bone spurs and osteoarthritis, but that those impairments did not cause more than a minimal effect on his ability to work.

Clark also argues the ALJ should have found that his obesity was a severe impairment. The record indeed reflects that Clark has a history of obesity. In November 2009, for example, Clark, who is 5' 8" tall, weighed in at 281 pounds. (Tr. 1069). Clark maintains that he suffers from obesity-related knee and ankle pain, and is so deconditioned due to his weight that he can only walk a few hundred yards before he gets winded and must stop to catch his breath. (Doc. 18, at 8). While the ALJ did not identify obesity as one of Clark's severe impairments

at step two,[1] he considered the obesity-related functional limitations Clark alleges later in the sequential evaluation process.  For example, the ALJ noted that in April 2006 Clark complained to VA physician Dr. Jonathan Bechard of shortness of breath due to deconditioning and indicated that his knees and legs bothered him due to his weight gain, but reported no other concerns at that time.  (Tr. 662; 754).  The ALJ pointed out that when Dr. Bechard examined Clark, however, he displayed "[s]trength normal bilaterally" and his "sensory exam" was "intact with no gross deficits."  (Tr. 665).

The ALJ addressed the fact that Clark was obese, noting that a physical examination several months later, in December 2006, revealed that he weighed 279 pounds and had a body mass index of 42.7.  (Tr. 646; 755).  As the ALJ went on to explain, however, Clark "had no atrophy" and his tone was good, his lower extremity strength was full at 5/5 bilaterally, and his heel, toe, and tandem walk demonstrated good coordination.  (Tr. 647, 755).  In fact, the same physical examination revealed no evidence of fatigue, weakness, or lack of endurance with repetitive use of his ankles or knees, and no objective evidence of weakness or abnormal movement.  (Tr. 648).  The ALJ found it noteworthy that by September

---

[1]    Notably, Clark did not allege obesity as a basis for disability at the administrative level, which likely explains why the ALJ did not specifically discuss obesity in his step two analysis.

2007, Clark reported to Dr. Bechard that he had lost some weight and was staying active building his new home. (Tr. 688, 755). Clark indicated he had no chest pain or shortness of breath, and was feeling well except for occasional joint and back pain. (Tr. 688, 755).

While the ALJ did not specifically mention obesity, it is clear from his detailed discussion of the medical evidence that he considered the severity of the obesity-related limitations Clark alleges, including knee and ankle pain and shortness of breath. After weighing all of the medical evidence and assessing Clark's credibility, the ALJ ultimately found that Clark's impairments and resulting limitations, including his alleged knee and ankle pain and shortness of breath, were not so severe as to preclude him from performing light work. Because the ALJ recognized that Clark was obese, and discussed the obesity-related limitations Clark identifies at step four, any alleged error in not categorizing Clark's obesity as severe at step two was harmless. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding that where the ALJ considered evidence relating to an impairment at step four, any error in failing to identify that impairment as "severe" at step two was harmless).

Clark next claims the ALJ should have categorized his depression as a severe impairment, citing a June 2005 report by consultative psychiatrist Dr.

Frederick Stegall.  Dr. Stegall diagnosed Clark with "[a]djustment disorder with mixed anxiety and depressed mood, chronic" and indicated that in light of Clark's "continuing sleep disturbance" he would be "unable to perform work activities on a consistent basis, and could not maintain regular attendance in the workplace or complete a normal workday/workweek since his waking hours are so significantly compromised."  As discussed below, however, the ALJ provided sufficiently specific and legitimate reasons for rejecting Dr. Stegall's opinion.

The ALJ reasonably relied on reports by VA psychiatrist Dr. Robert Bateen and consultative psychiatrist Dr. Mark Mozer, along with the testimony of medical expert Dr. Ed Trontel, in finding that Clark's depression was "largely situational and resulted in no more than mild limitations."  (Tr. 747-48).  Dr. Bateen examined Clark in December 2006 and found that Clark's symptoms were "relatively mild and situational."  (Tr. 640).  Dr. Bateen indicated that Clark would have no difficulty understanding, remembering, and carrying out detailed and simple directions, had "well developed social skills" and would "be able to interact well with others in the job setting", had been able to maintain friendships, and was capable of engaging in normal activities of daily living.  (Tr. 640).  Dr. Mozer likewise found after examining Clark in September 2006 that Clark's

depression was mild. (Tr. 606). At the first administrative hearing in May 2008, clinical psychologist Dr. Trontel testified based on his review of the medical record that Clark's depression caused only mild limitations. (Tr. 38-42). The ALJ's step two analysis is thus supported by substantial evidence.[2]

## B.    Listed Impairments

Clark argues the ALJ erred at step three by finding that he did not satisfy the criteria for presumptive disability under Listing 3.10 for sleep-related breathing disorders, or Listing 12.04 for affective disorders. At this third step in the sequential evaluation process, the ALJ must consider whether the claimant's impairment, or combination of impairments, meets or equals an impairment listed in 20 C.F.R. P. 404, Subpt. P, App. 1. "If the claimant meets or equals one of the listed impairments, a conclusive presumption of disability applies." *Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990). To meet the requirements of a listing, the claimant "must have a medically determinable impairment(s) that satisfies all

---

[2] To the extent Clark maintains the ALJ erred because he did not evaluate his depression and adjustment disorder using the special psychiatric review technique described in 20 C.F.R. § 404.1520a and *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 726 (9th Cir. 2011), he is mistaken. The ALJ specifically considered and discussed the degree of Clark's functional limitations in the four requisite areas – activities of daily living, social functioning, concentration/persistence/pace, and episodes of decompensation. 20 C.F.R. § 404.1520a(b)-(c). (Tr. 747-48).

of the criteria in the listing." 20 C.F.R. § 404.1525(d).

To demonstrate medical equivalence, the claimant must have impairments, considered alone or in combination, that are "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404. 1526(a). The Ninth Circuit has made clear that the "ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment." *Lewis v. Apfel*, 236 F f.3d 505, 512 (9th Cir. 2001). Nevertheless, the burden remains with the claimant, who must present medical evidence that his impairments meet or medically equal all of the criteria of a listed impairment. *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990).

The ALJ considered whether Clark's obstructive sleep apnea satisfied the criteria of Listing 3.10, but found that it did not. Listing 3.10 provides that alleged disability based on sleep-related breathing disorders is to be evaluated under the criteria of Listing 3.09 for chronic cor pulmonale secondary to chronic pulmonary vascular hypertension, or Listing 12.02 for organic mental disorders. 20 C.F.R. pt. 404, subpt. P, app. 1 § 3.10. The ALJ evidently considered Listing 3.09, which requires, among other things, clinical evidence of cor pulmonale with either mean pulmonary artery pressure greater than 40 mm Hg or Arterial hypoxemia. The

ALJ found no evidence that Clark had "the requisite mean pulmonary artery pressure greater than 40 mm Hg or arterial hypoxemia," and so properly determined that his obstructive sleep apnea was not so severe as to satisfying Listing 3.10. Clark does not point to any evidence to the contrary.

As discussed above, the ALJ appropriately found that Clark's depression was not a severe impairment, and so was under no obligation to specifically consider Listing 12.04. Regardless, Clark does not point to any evidence that his depression was so severe as to meet or equal the criteria of Listing 12.04, which requires that a claimant's mental impairments result in at least two of the following paragraph B criteria: marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation each of extended duration. 20 C.F.R. pt. 404, subpt. P, app'x 1, § 12.00C. The ALJ reasonably found based on the evidence of record that Clark's depression caused only minimal restrictions in these areas.

Listing 12.04 also provides for alternative paragraph C criteria requiring:

Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to perform basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1)

[r]epeated episodes of decompensation, each of extended duration; or (2) [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt 404, subpt. P, app. 1, § 12.04C.

Clark does not point to any evidence suggesting that these criteria are satisfied here, and the Court finds none in the record. The Court thus concludes that the ALJ's step-three analysis is supported by substantial evidence and free of error.

### C.    Medical Opinions

1.    Dr. Stegall

Clark maintains the ALJ failed to cite sufficiently specific and legitimate reasons for rejecting the opinion of consultative psychiatrist Dr. Frederick Stegall.[3] Dr. Stegall concluded that in light of Clark's obstructive sleep apnea, which resulted in "continuing sleep disturbance," he would be "unable to perform work

---

[3] Because Dr. Stegall's opinion was contradicted by the opinions of the state agency reviewing physicians, the ALJ could reject it for specific and legitimate reasons. *See Widmark v. Barnhart,* 454 F.3d 1063, 1066-67 (9th Cir. 2006) (holding that the "specific and legitimate" standard applies where there is a conflict between the opinions of an examining physician and a reviewing physician).

activities on a consistent basis, and could not maintain regular attendance in the workplace or complete a normal workday/workweek since his waking hours are so significantly compromised." (Tr. 520-26).

The ALJ considered Dr. Stegall's opinion, but gave it little weight because Dr. Stegall had not reviewed any of Clark's medical records regarding his history of obstructive sleep apnea and did not perform any independent testing to determine the severity of his symptoms. (Tr. 759). The ALJ legitimately discounted Dr. Stegall's opinion on the additional basis that he relied largely, if not exclusively, on Clark's self-report regarding the persistence, intensity, and limiting effects of his sleep apnea. As discussed below, the ALJ provided sufficiently clear and convincing reasons for finding Cark less then entirely credible. Having done so, he permissibly discounted Dr. Stegall's opinion because it was based primarily on Clark's self-report. (Tr. 520-26; 759). *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (explaining that where the ALJ has properly determined that a claimant's description of her limitations was not entirely credible, the ALJ could reasonably discount a physician's opinion "that was based on those less than credible statements.")

### 2. Nurse Practitioner Sturdevant and Dr. Belleville

Clark also argues the ALJ failed to provide specific and legitimate reasons for discounting Rebecca Sturdevant, a nonphysician health care provider who examined him on September 26, 2006, in association with consultative physician Dr. Bruce Belleville. (Tr. 596-601). Sturdevant assessed Clark's functional limitations as follows:

> He has weakness in his right upper extremity. He has difficulty with balance and becomes short of breath with walking and stair climbing. He has difficulty with concentration and alertness, and chronic migraines which cause periods of inactivity two or three times a week for two or three hours to resolve. He has intermittent periods where he is unable to walk due to severe gout.

 (Tr. 601).

The ALJ accepted that Clark had some weakness in his right upper extremity, as evidenced by the fact that he restricted him from work that would involve lifting above shoulder height. (Tr. 750-51). The ALJ also accommodated for Clark's balance problem and difficulty climbing stairs by finding that he could only occasionally climb stairs, could never climb ladders, ropes, or scaffolds, and could not work around unprotected heights. (Tr. 750-51; 759). But the ALJ rejected Sturdevant's opinion as to the severity and limiting effects of Clark's migraines, gout, and sleep apnea because the medical evidence he discussed at length elsewhere in the decision demonstrated that those impairments were well-

controlled, and that his sleep had improved.  (Tr. 759).

While Sturdevant accepted that Clark had incapacitating migraines two to
three times a week for two to three hours at a time, the ALJ cited contradictory
evidence that Clark's migraines did not occur with such frequency and were
adequately controlled on medication.  (Tr. 688; 690).  In September 2007, for
example, Clark reported that his migraines were under control on his current
treatment plan and his physician wrote that they were "adequately managed."  (Tr.
688; 690; 755).  The ALJ also cited evidence that, in previous years, Clark's
migraines had been successfully treated with inhaled Imitrex, ibuprofin, and
Valium.  (Tr. 758).  In March and July 2004, for example, Clark reported having
two to three migraines per month, treating the mild ones with ibuprofin, and
treating the severe ones with Diazepam, Imetrix, or Valium.  (Tr. 415, 423, 437).
Treatment notes from September 2004 indicate that the inhaled form of Imetrix
worked well. (Tr. 481).

The ALJ also pointed to evidence that Clark's gout was well controlled on
allopurinol.  (Tr. 757).   The ALJ recognized that Clark's gout flared up in March
2005, but noted that this was because Clark was not taking his allopurinol on a
regular basis.  (Tr. 403; 757). In July 2006, Clark reported having two to three

gout flare ups a year, and by September 2007 he indicated that he had experienced

no flare ups on allpurinol.  (Tr. 688; 755; ).  The ALJ also noted that in finding

that Clark's gout sometimes left him unable to walk, Sturdevant apparently

accepted his statement that his gout causes him "so much pain that he has to crawl

[o]n his hands and knees or even use a wheelchair."  (Tr. 598; 757).  As the ALJ

noted, however, there was "no evidence elsewhere in the record that [his] gout had

ever caused such significant immobility, particularly when taking his allpurinol as

prescribed."  (Tr. 757).

As for Clark's sleep apnea, the ALJ accepted that the impairment was

severe, and acknowledged that Clark's "medical records showed a long term

struggle with obstructive sleep apnea," including surgery and difficulties

tolerating a Continuous Positive Airway Protection (CPAP) device.  (Tr. 758).

The ALJ also agreed that "some daytime somnolence would reasonably be

expected with [Clark's]intolerance of the CPAP, but found that "[o]verall, the

record did not support severe daytime somnolence."  (Tr. 758).   As the ALJ noted,

for example, a VA sleep study in 2007 showed that he had mild sleep apnea,

which responded well when he used his CPAP.  (Tr. 754;  1029).  The ALJ

permissibly discounted Sturdevant's opinion that Clark's daytime somnolence

would cause him significant difficulty with alertness and concentration because there was substantial evidence of record to the contrary.

3.    Dr. Mozer

Consultative physician Dr. Mark Mozer examined Clark in September 2006, and diagnosed him with mild depression.  (Tr. 604-08). Dr. Mozer found that Clark had no significant difficulties with activities of daily living, was reasonably outgoing, and had no problems with concentration, persistence, or pace.  (Tr. 607). Dr. Mozer nonetheless speculated that Clark "might not be capable of functioning at his previous occupation" as a physician assistant, but would be "capable of low stress work activity that is compatible with his physical condition." (Tr. 607). Clark argues the ALJ erred by not specifically considering Dr. Mozer's statement that he could only engage in low stress work.

But because of the equivocal nature of Dr. Mozer's statement, and in light of the fact that he clearly found that Clark's depression was mild and did not cause him any significant limitations, any error on the ALJ's part in failing to address Dr. Mozer's statement was harmless because it was "inconsequential to the ultimate nondisability determination in the context of the record as a whole." *Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012).

### 4. Dr. Hohenegger

Clark contends the ALJ also erred by not crediting examining physician Dr.

Miles Hoehenegger's observation in November 2003 that his depression would

"intermittently impair his occupational inefficiencies." (Tr. 455). As the ALJ

specifically noted, however, Dr. Hohenegger went on to explain that any such

intermittent impact "would by no means be a basis to preclude employment." (Tr.

456; 759). The ALJ reasonably relied on Dr. Hoehenegger's records as support

for his decision that Clark was not disabled.

### D. Credibility

Clark next argues the ALJ failed to cite sufficiently clear and convincing

reasons for discrediting his testimony.

If the ALJ finds "the claimant has presented objective medical evidence of

an underlying impairment which could reasonably be expected to produce the pain

or other symptoms alleged," and "there is no evidence of malingering, the ALJ can

reject the claimant's testimony about the severity of her symptoms only by

offering specific, clear and convincing reasons for doing so." *Lingenfelter v.*

*Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citations

omitted). Clark met his initial burden because he provided evidence that he has

underlying impairments that could reasonably be expected to produce some degree of pain, and the ALJ did not find that he was malingering. As set forth below, however, the ALJ then provided clear and convincing reasons for finding Clark's subjective testimony only partially credible.

Clark submitted a disability report alleging he suffers "totally incapaciting" migraine headaches one to two times a week, which "put me down for a day." (Tr. 240). At his most recent administrative hearing, Clark similarly testified that he has disabling migraines two to three days a week. (Tr. 819). He claimed his gout prohibits him from walking and keeps him off his feet for two to three days at a time, "a couple of times a month." (Tr. 240). Clark also indicated that he uses a CPAP machine at night for his sleep apnea, but can only stay awake for about four hours at a time. (Tr. 240). He alleged memory loss and said he has "no memory recall." (Tr. 240).

The ALJ reasonably questioned Clark's credibility in part because he "described numerous daily activities, which were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 760). Clark described engaging in a number of activities after his alleged onset date, including remodeling his house (Tr. 428), restoring cars (Tr. 428), painting a

friend's home (Tr. 415), traveling between Montana and Washington state (Tr. 400), sanding sheetrock (Tr. 440), taking a welding class at the local junior college (Tr. 102, 599), and completing a semester-long realty course (Tr. 75-76).  Clark argues that it was only with difficulty that he participated in these activities, and that his ability to do so is not indicative of his ability to perform work related tasks on a sustained basis.   But the ALJ reasonably found the fact that Clark reported engaging in those activities after his alleged onset date not consistent with his testimony that he was so debilitated by his sleep apnea that he could not stay awake for more than four hours at a time, and was completely incapacitated several days every month due to gout and migraines.

The ALJ also questioned Clark's credibility based on various inconsistencies in the record.  (Tr. 758).   The ALJ noted that while Clark alleged his gout was so severe that every month he was unable to walk for two or three days at a time, there was no medical evidence that he so "immobilized by his gout flares that he had to crawl on his hands and knees or use a wheelchair" as he claimed.  (Tr. 758).  As discussed above, medical records cited by the ALJ reflect that Clark told his doctor in July 2006 that he had only two to three gout attacks every year.  (Tr. 758).  The ALJ reasonably found that inconsistencies like those

undermined Clark's credibility.

The ALJ permissibly cited evidence that Clark had stopped working for reasons unrelated to his alleged disability as an additional basis for his adverse credibility determination. (Tr. 752). In particular, the ALJ pointed to evidence indicating that Clark was let go for filing "reverse discrimination charges" against his employer. (Tr. 704). In fact, Clark has given different explanations for why he was fired, stating in September 2006 that it was because he had taken too much time off because of health problems, but reporting in April 2007 that he was fired for abandoning his post when he went to the post office on his lunch break to file his discrimination claim. (Tr. 604; 704).

Finally, the ALJ found Clark's subjective testimony only partially believable because it was it was not supported by the objective medical evidence, which the ALJ chronicled in great detail in the text of his decision. These constitute sufficiently clear and convincing reasons for finding Clark's subjective testimony only partially believable.

### E.     Lay Testimony

Clark next argues the ALJ failed to provide germane reasons for rejecting  a written statement submitted by his girlfriend, Cathy Lippincott, and a Function

Report form completed by his friend Susan Wheeler.  (Tr. 211-12; 258-66).

It is well-established in the Ninth Circuit that the "ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Commissioner*, 454 F.3d 1050, 1053 (9th Cir. 2006) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 2003); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e)).  "If the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." *Stout*, 454 F.2d at 1053 (quoting *Dodrill*, 12 F.3d at 919).

Lippincott wrote that she "watched him try to go back to work after he was fired" but that he was depressed and could not "be on his feet as needed and he would go home and nap at noon then almost straight to bed after work."  (Tr. 211-12).  Wheeler similarly indicated that Clark could not stand for long periods of time would have to take breaks when working on cars or doing chores around the house.  (Tr. 258-60).  The ALJ found that both lay witness statements were similar to Clark's own allegations, and credited them only to the extent they were consistent with his residual functional capacity assessment.  (Tr. 76).  To the extent the lay witnesses described limitations that were not consistent with the ability to perform light work, any error on the ALJ's part in failing to more

specifically address their lay testimony was harmless light of the fact that their testimony essentially mirrored Clark's, which the ALJ properly discredited. *See e.g. Molina v. Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012); *Valentine v. Commissioner Social Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009).

### F. Appeals Council

Finally, Clark argues the ALJ's decision should be reversed based on evidence he submitted to the Appeals Council. (Tr. 725-28). The Appeals Council explained that it considered the evidence, but found that it did not provide a basis for changing the ALJ's decision because it "encompassed a period from June 18, 1991 through December 14, 2000, several years prior to" Clark's alleged onset date in September 2003 and so did not relate to the relevant time period. (Tr. 725). The Appeals Council also found that the additional evidence did not indicate that Clark was more limited than found by the ALJ. (Tr. 725-28).

Clark simply argues that the evidence did in fact support his allegations of disability and also showed that he lost his job because of his impairments. (Doc. 18, at 33). As the Appeals Council found, however many of those records significantly predated Clark's alleged onset date. (Tr. 1087-1095) Others postdate the expiration of his insured status by several months or more. (Tr. 1096-

1158).  As the ALJ explained at the most recent administrative hearing, if Clark's condition deteriorated after the expiration of his insured status, his remedy is to file a new application for benefits.  *See e.g. Osenbrock v. Apfel*, 240 F.3d 1157, 1164 (9th Cir. 2001).  Clark does not explain how any of the materials he submitted in support of his request for review might have changed the ALJ's decision.  Having reviewed those materials, the Court is satisfied that they do not provide a basis for changing the ALJ's decision, which is supported by substantial evidence of record.

## IV.  **Conclusion**

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of legal error.  Accordingly,

IT IS RECOMMENDED that Clark's motion for summary judgment be DENIED, the Commissioner's motion for summary judgment be GRANTED, and the Commissioner's decision be affirmed.

DATED this 8th day of January, 2014

Jeremiah C. Lynch
United States Magistrate Judge